UNITED STATES of America, Plaintiff,

v.

14,770.65 ACRES OF LAND, MORE or LESS, SITUATED in the COUNTY of RICHLAND, STATE of SOUTH CAROLINA, and Congaree Limited Partnership, et al., Defendants.

Civ. A. No. 77–2046.

United States District Court,
D. South Carolina,
Columbia Division.

Aug. 16, 1985.

Don E. Strouse, Washington, D.C., and Wistar D. Stuckey, Columbia, S.C., for plaintiff.

Terrell L. Glenn and Charles Porter, Columbia, S.C., Philip Nacke and Charles Appler, Washington, D.C., and Hubert B. Humphrey, Greensboro, N.C., for defendants.

## MEMORANDUM OF DECISION

GORDON, Senior District Judge.

This condemnation proceeding concerns the acquisition of land by the United States under its power of eminent domain for the Congaree Swamp National Monument, a unit of the National Park System established by Congress in the Act of October 18, 1976, Pub.L. No. 94–545, 90 Stat. 2517. The tract now at issue, comprising some 14,770.65 acres of the total 15,138.25 acres acquired for the monument, is located in Richland County, South Carolina, and was formerly owned by defendant Congaree Limited Partnership ("Congaree" or "the landowners"), a limited partnership organized under the laws of the State of Illinois.[1] Plaintiff is the United States (collectively, "the government"), acting through the National Park Service ("NPS") of the Department of the Interior ("DOI"), the acquiring agency, which of course is represented herein by the government's primary

---

1. Consolidated proceedings as to three portions of the overall property delineated in the Act for acquisition, totaling 367.60 acres in size, which were formerly owned by Congaree and certain other defendants, have previously been concluded in this Court by the entry of final judgments on September 27, 1984 (which vested title in the United States).

litigation arm, the Department of Justice ("DOJ").

Although the fair market value component of the just compensation due to Congaree for the property which is the subject of this action has been decided by this Court, there remains for resolution the amount of damages for delay in payment, or interest, which the government is obligated to pay as part of just compensation.[2] Specifically, the issue now before the Court on cross-motions by the parties, is a determination as to the date from which the government's interest obligation commences to accrue.[3]

The Court has carefully reviewed the motions, briefs, supporting papers of both parties, replies thereto filed by both parties, evidence proffered and the entire record in this case. Oral argument on the issue was heard on May 8, 1985. After full consideration of all the foregoing, including proposed findings submitted by the parties, and being fully advised in the premises, the Court concludes that, under the principles of *U.S. v. Dow*, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958), and its progeny, as applied and adapted to the rather peculiar facts of the subject case, the defendant Congaree shall prevail and shall recover interest as an element of just compensation from February 23, 1978, the date of taking in this case. Now, pursuant to this disposition, the Court finds and concludes the following facts:

**2.** *See, e.g., Seaboard Air Line Ry. Co. v. United States,* 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664 (1923).

**3.** By Stipulation dated July 19, 1983, approved by the Court in its Order of July 21, 1983, the parties have agreed as to the *rates* of interest to be applied and the method of applying those rates.

**4.** The Court should first note that both parties to this litigation submitted quite lengthy proposed findings of facts which, to a large extent, have been condensed, modified, and adopted in the final Findings of Fact which follow. Also, it bears mentioning that a more detailed and relatively objective description of these legislative and related background facts which occurred prior to the initiation of the subject case is presented in the Landowner's Memorandum in Support of its Motion of Determination of the

## I. FINDINGS OF FACT [4]

### Background

For a number of years prior to passage of the legislation creating the Congaree Swamp National Monument, attention had been directed to the virgin hardwood forest located in the flood-plain of the Congaree River as an area worthy of preservation. A larger area including the tract now at issue had been considered for inclusion in the National Park System as early as 1963, and by the mid-1970's attention was focused primarily on the so-called "Beidler Tract" owned by defendant Congaree. Legislation proposing creation of the "Congaree Swamp National Preserve" was introduced in the House of Representatives in February 1976, and in the Senate in May of that year. [Government Documents 3, 6, 7, 10, 11, 12, and 13.][5]

The goal of this legislation, as revealed by the legislative record before this Court, was to preserve the Beidler Tract for the enjoyment and education of future generations. Accordingly, considerable discussion and attention was given, during the process of legislative consideration, to defendant's then-ongoing program of timber sales on the property. As early as April 1976, NPS officials initiated discussions with representatives of defendant concerning protection of the tract from further harvesting, and, by August 1976, defendant was requested by both NPS and by members of

Date for which Damages for Delay in Payment Accrue (filed March 29, 1985), pp. 4–13.

**5.** The Hon. Robert W. Hemphill's 75 page Order as to Objections filed to the Final Report of the Land Commissioners, filed July 8, 1982, and his 107 page Amended Order regarding the same, filed July 19, 1983, both contain additional factual findings deemed most pertinent to the valuation stage of this very lengthy and time-consuming case. In fact, in considering the longevity of this controversy, a cynical observer faced with the veritable deluge of paper utilized in this case might reasonably conclude that the quantity of "virgin hardwood trees" preserved in the Congaree Swamp National Monument has been almost equally offset by the enormous amount of pulpwood products necessarily devoted to the resulting litigation. However, such a finding is now beyond judicial notice or remedy. (Alas!)

Congress to agree to a voluntary moratorium on further sales of timber from the property. Acceding to these requests, defendant agreed to a voluntary moratorium on further timber sales from its property until October 1, 1977. [Government Documents 9 and 19; Congaree Document 1.]

During the same time frame, Congress, "in order to preserve and protect for the education, inspiration, and enjoyment of present and future generations an outstanding example of a near-virgin southern hardwood forest situated in the Congaree River floodplain in Richland County, South Carolina," enacted legislation creating the Congaree Swamp National Monument Act of October 18, 1976, Pub.L. No. 94–545, 90 Stat. 2517. Other pertinent provisions of the authorizing legislation read:

> The monument shall consist of the area within the boundary as generally depicted on the map entitled 'Congaree Swamp National Monument,' numbered CS–80, 001–B, and dated August 1976 (generally known as the Beidler Tract), which shall be on file and available for public inspection in the offices of the National Park Service, Department of the Interior. Following reasonable notice in writing to the Committees on Interior and Insular Affairs of the Senate

and House of Representatives of his intention to do so, the Secretary of the Interior ... may make minor revisions of the boundary of the monument by publication of a revised map or other boundary description in the Federal Register, *but the total area may not exceed fifteen thousand, two hundred acres.* (emphasis added).

> . . . . .

> Sec. 2(b) With respect to any lands acquired under the provisions of this Act which at the time of acquisition are leased for hunting purposes, such acquisition shall permit the continued exercise of such lease in accordance with its provisions for its unexpired term, or for a period of five years, whichever is less: *Provided,* that no provision of such lease may be exercised which, in the opinion of the Secretary, is incompatible with the preservation objectives of this Act, or which is inconsistent with applicable Federal and State game laws, whichever is more restrictive.

> . . . . .

> Sec. 5(a) The Secretary may not expend more than $35,500,000 from the Land and Water Conservation Fund for land acquisition nor more than $500,000 for the development of essential facilities.[6]

---

6. By the Act of June 10, 1977, Pub.L. No. 95–42, ¶ 3, 91 Stat. 210, the Land and Water Conservation Fund Act of 1965 provision concerning "allocation of land and water conservation fund moneys for Federal purposes," 16 U.S.C. § 460*l*–9, was amended as follows:

> (3) Section 7(a) is amended by adding the following new paragraph:

> "(3) Appropriations allotted for the acquisition of land, waters, or interests in land or waters as set forth under the headings 'National Park System; Recreation Areas' and 'National Forest System' in paragraph (1) of this subsection shall be available therefor notwithstanding any statutory ceiling on such appropriations contained in any other provision of law enacted prior to the convening of the Ninety-fifth Congress ...; except that for any such area expenditures may not exceed a statutory ceiling during any one fiscal year by 10 per centum of such ceiling or $1,000,000, whichever is greater. The Secretary of the Interior shall, prior to the expenditure of funds which would cause a statutory ceiling to be exceeded by $1,000,000 or more, and with respect to each expenditure of $1,000,000

or more in excess of such a ceiling, provide written notice of such proposed expenditure not less than thirty calendar days in advance to the Committee on Interior and Insular Affairs of the House of Representatives and the Committee on Energy and Natural Resources of the Senate."

Under this amendment, the initial statutory authorization of $35.5 million for land acquisition in connection with the establishment of the Congaree Swamp National Monument was automatically expanded by ten percent (10%) of that amount, per (fiscal) year. *See* Government Document No. 133, at pp. 3–4 (letter from DOI Acting Assistant Solicitor, Parks and Recreation, to NPS Director, February 11, 1980, explaining, *inter alia,* the meaning and effect of this amendment). Thus, for example, due to the operation of this amendment, as of the date of possession the existing statutory authorization for acquisition of the Large Tract was $39,050,000—*i.e.,* $35,500,000 (authorized in the Act) plus a ten percent increase of that amount for one fiscal year, of $3,550,000. By the time the declaration of taking was filed on February 22, 1980, the existing authorization was $46,150,000. [Government Document No. 133.]

The record thus demonstrates an unequivocal intention on the part of Congress, expressed both in the statute itself and its legislative history, that the Beidler Tract be preserved in its then-existing condition and acquired for the permanent enjoyment of the people of the United States. [Government Documents 23 and 34.]

*Acquisition of the Timber Sales Tracts*

Upon enactment of the legislation, the primary executive branch responsibility for carrying out the expressed will of the Congress devolved upon the DOI, acting through the NPS. Though the voluntary moratorium on further timber sales was in effect, there were three areas of the overall tract on which preexisting timber sales contracts had been executed, and which were still active.[7] NPS quickly moved to prevent further operations under those contracts. In connection with this effort, NPS informed Senator Thurmond on March 1, 1977, that the government was "determined to stop further cutting within the boundaries of Congaree Swamp National Monument." [Government Documents 39–43 and 45–47; Congaree Document 2.]

On April 11, 1977, efforts to reach a negotiated purchase having failed, the government commenced condemnation proceedings against the Timber Sales Tracts, naming as defendants, *inter alia,* Congaree and the entities to whom Congaree had sold timber harvesting rights. The government described the nature of its acquisition by stating that:

> The interest in the property to be acquired is as to Tracts 101–03, 101–04 and 101–05, an estate in fee simple title, subject to existing easements for public roads and highways, public utilities, railroads, and pipelines.

[Complaint for Condemnation, ¶¶ 1, 2 and 4 (filed April 11, 1977), in *United States v.*

*367.60 Acres of Land,* Civ. Action Nos. 77–652, 77–653 and 77–654.]

In addition to the foregoing complaint commencing the proceedings as to the Timber Sales Tracts, the government also filed on April 11, 1977, a declaration of taking as to those properties, accompanied by a deposit of the government's estimate of the just compensation owed to defendants. The declaration of taking had the effect of vesting in the government title to, and the immediate right to possession of, the Timber Sales Tracts, and on April 12, 1977, the Court entered its "Order for Delivery of Possession," directing that all defendants surrender possession immediately to the United States. [Declaration of Taking (filed April 11, 1977) and Order for Delivery of Possession (filed April 12, 1977), in *United States v. 367.60 Acres of Land,* Civ. Action Nos. 77–652, 77–653 and 77–654; *see* 40 U.S.C. § 258a.]

*Proceedings Regarding the Large Tract*

At the time condemnation proceedings were commenced on the Timber Sales Tracts, no proceedings were begun as to the remaining acreage of the Beidler Tract (*i.e.,* the Large Tract), on which defendant's voluntary moratorium on further timber sales was still effective. By mid-May of 1977, NPS had available to it an approved appraisal of the Large Tract, which showed a value for that property of $32,936,000. This amount, when combined with the amounts already deposited in connection with the Timber Sales Tracts, was within the congressionally authorized limit on acquisition expenditures, in effect at that time, of $35,500,000 set forth in the Act establishing the Monument.

During 1977, discussions between Congaree and NPS regarding proposals by both parties for a negotiated purchase of the Large Tract were unsuccessful. The

---

The Act of October 18, 1976, was amended further by the Act of October 31, 1983, Pub.L. No. 98–141, § 6, 97 Stat. 909, which explicitly enlarged the statutory authorization for land acquisition at Congaree Swamp National Monument from $35,555,000 to $60,500,000. *See* Government Document No. 145.

7. These three small areas, totaling 367.60 acres of the total tract of 15,135.25 acres, are hereinafter sometimes referred to as the "Timber Sales Tracts." The remaining acreage of 14,770.65 acres is sometimes referred to as the "Large Tract."

voluntary moratorium on further timber sales expired on October 1, 1977. Congaree was unwilling to extend that moratorium further due to the fact that the general partners of Congaree felt themselves to be under a fiduciary obligation to generate income from the property, for the beneficiaries of the trusts which were Congaree's limited partners, through resumed sales of timber harvesting rights. The government, on the other hand, asserted that (a) it could not purchase the entire property immediately, even at its own price, because Congress had not yet appropriated sufficient funds, and (b) it could not acquire the property by declaration of taking because (i) such a course of action could result in a court award in excess of the statutory authorization ceiling, there being so little margin between NPS' appraisal and said ceiling, and (ii) such a course of action would unconditionally commit the government to pay the court award, thereby requiring Congress to raise the authorization ceiling, whereas NPS desired to maintain for Congress the additional options of reducing the size of the area to be acquired or of deauthorization of the project if the court award exceeded the authorization ceiling. It was in this context that condemnation proceedings to acquire the Large Tract were commenced. [Government Documents 69, 72–74, 75, 77, 70 and 80; Congaree Document 3.]

## The Subject Case

On October 14, 1977, two weeks after the landowner's voluntary moratorium expired, the United States commenced a condemnation proceeding against the Large Tract. As in the case of the Timber Sales Tracts, the government's complaint set forth, *inter alia*, the nature of the action, the statutory authority underlying it, the purpose for the acquisition, and the estate to be acquired.

In part, the complaint stated:

1. This is an action of a civil nature brought by the United States at the request of the Solicitor of the Department of the Interior of the United States of America for the taking of property under the power of eminent domain and for the ascertainment and award of just compensation to the owners and parties in interest.

2. The authority for the taking is under and in accordance with the Act of Congress approved August 1, 1888, 25 Stat. 357, as amended, 40 U.S.C., sec. 257; the Land and Water Conservation Fund Act of 1965, 78 Stat. 897, as amended, 16 U.S.C., sec. 460*l*-4, *et seq.;* and under the further authority of the Act of Congress approved October 18, 1976, 90 Stat. 2517, 16 U.S.C., sec. 431, which act authorized the Congaree Swamp National Monument; and under the authority of the Department of the Interior and Related Agencies Appropriation Act, 1978, 91 Stat. 287, which act appropriated funds for such purpose.

3. The public use for which the property is to be taken is for the proper administration, preservation, and development of the Congaree Swamp National Monument for the use, benefit and enjoyment of the public.

4. The *interest in the property to be acquired is* as to Tract 101–02, an estate in *fee simple title*, subject to existing easements for public roads and highways, public utilities, railroads, and pipelines. (Emphasis added.)

Complaint in Condemnation ¶¶ 1–4 (filed October 14, 1977), in *United States v. 14,770.65 Acres of Land,* Civ. Action No. 77–2046.[8] Aside from a difference in the appropriations statute cited, the complaint as to the Large Tract recited the same statutory authority for the taking as had the earlier complaint involving the Timber Sales Tracts, with the exception that since the government did not file a declaration of taking as to the Large Tract, no reference to 40 U.S.C. § 258a was made.

## The Government's Motion for Possession

In an attempt to assure preservation of the Large Tract in its then-existing condi-

---

**8.** All further citations herein to previous court filings shall pertain to filings in Civil Action No. 77–2046 (involving the Large Tract), unless otherwise noted.

tion and "to allow Congress to intelligently determine if the public benefit from the project is balanced by the cost of the acquisition," Government's Motion for Order of Possession, at p. 5 (filed November 14, 1977), and instead of a Declaration of Taking as was filed on the Timber Sales Tracts, the government filed, on November 14, 1977, a Motion for Order of Possession.

The government's "Motion for Order of Possession" asked this Court "to enter its order granting the United States possession of the ... [Large Tract], subject to those possessory rights, if any, granted by lease for hunting purposes." [9] In the memorandum filed with this motion, the government quoted at length from the legislative record to demonstrate Congress' intent that the property be preserved, summarizing with the following:

> It can readily be seen that it was the concern of both the Legislative and Executive Branches of Government to preserve the Beidler Tract and its interdependent eco-systems for future generations of Americans. Section 2(a) of the Act provided that the Secretary of Interior was authorized " * * * to acquire lands, waters and interests therein * *." Pursuant to this authority and in furtherence [sic] of the Congressional direction the instant case has been filed.

[Government's Motion for Order of Possession, at p. 1 (filed November 14, 1977); Government's Memorandum of Points and Authorities in Support of Motion for Order of Possession, at pp. 3–4 (filed November 14, 1977).]

The government went on to argue that possession of the Large Tract was necessary to prevent the timber sales operations then envisioned by Congaree. In arguing that the Court could appropriately enter an order of immediate possession, the government, in its supporting memorandum, asserted that Congaree would not be harmed if the government's request were granted:

> The landowner is protected for, if the Government does not acquire title, the United States must pay for the possession actually had. *See, e.g., Danforth v. United States, supra* [308 U.S. 271] at 285 [60 S.Ct. 231, 236, 84 L.Ed. 240 (1939)]; *Commercial Station Post Office v. United States, supra* [48 F.2d 183] at 185–86 [(8th Cir.1931)] and cases cited therein.

Rule 71A(i)(3), F.R.Civ.P., provides that:

> At any time before compensation for a piece of property has been determined and paid and after motion and hearing, the court may dismiss the action as to that property, except that *it shall not dismiss the action as to any part of the property of which the plaintiff has taken possession* or in which the plaintiff has taken title or a lesser interest, *but shall award just compensation for the possession,* title or less interest *so taken.* [Emphasis in government's memorandum.]

Therefore, even if this action would be dismissed, the defendant is guaranteed payment for possession taken. This is adequate provision for payment as required by the Supreme Court. *Joslin Co. v. Providence,* 262 U.S. 668, 677 [43 S.Ct. 684, 688, 67 L.Ed. 1167]; *Hanson Lumber Co. v. United States, supra* [261 U.S.] at 587 [43 S.Ct. 442 at 444, 67 L.Ed. 809].

> *If the Government completes the acquisition of title through the condemnation process, the defendants are likewise uninjured by the early grant of possession.* The taking of possession fixes the date of evaluation, so that the trial is concerned with value on a date certain. *United States v. Dow, supra. Not only does the early taking of possession fixed [sic] the date of evaluation, but interest on the award runs from the date of possession;* thus providing compensation for the possession. *E.g., United States v. Dow, supra* [357 U.S.] at 22 [78 S.Ct. at 1044]. [Emphasis added.]

**9.** It will be recalled that the Act establishing the monument had specified that the acquisition allow continued exercise of hunting rights leased, subject to certain qualifications. *See* Act of October 18, 1976, Pub.L. No. 94–545, § 2(b), 90 Stat. 2517.

[Government's Memorandum of Points and Authorities in Support of Motion for Order of Possession, at pp. 6–7 (filed November 14, 1977).]

Defendant Congaree opposed the government's motion, arguing that separate statutory authority was necessary for the government to acquire possession without making any deposit of estimated just compensation. Such an independent statutory basis not being present in this instance, Congaree asserted that to have possession the government had to file a declaration of taking and a deposit of estimated just compensation. Accordingly, in Congaree's view, the Court was without authority to enter an order granting the government's motion.[10]

With the filing of the foregoing materials (*i.e.*, the government's motion and supporting memorandum and Congaree's response in opposition), the matters in dispute at that time distilled to the following:

(a) The government sought the right to possession of the Large Tract in order to preserve same; the government was unwilling to make any deposit of its estimated just compensation, in whole or in part; and the government was desirous of maintaining the option of abandoning the acquisition (an option which would not be available to it if it sought and acquired posses-

sion through employment of the Declaration of Taking Act).

(b) Congaree sought to prevent the government from gaining possession of the Large Tract. Acquisition of possession pursuant to court order, according to Congaree, required that a declaration of taking be filed along with a deposit of the government's entire estimate of just compensation (which at that time was $32,936,000), which deposit in turn could be withdrawn from the Court by Congaree, as allowed by the Declaration of Taking Act. Such a declaration of taking would, of course, automatically vest in the United States title to the said lands in fee simple absolute and would irrevocably commit the United States to the payment of the ultimate award of just compensation; no abandonment could thereafter occur. 40 U.S.C. §§ 258a, 258c, 258e.

The matter now before the Court was not initially disputed then—as its supporting memorandum shows, the government acknowledged its obligation to pay interest from the time it entered into possession.[11] Congaree obviously was of the same view since it did not make any contrary assertions in its opposing response.

### The Stipulation Agreement

The record reveals that after the filing of the government's motion for possession,

---

**10.** The government, of course, had argued in late 1977 that there was authority for granting its request for immediate possession even though no contemporaneous deposit was contemplated. Implicitly in its recent briefs on the issue now before the Court and explicitly at oral argument on May 8, 1985, the government now asserts that it had no authority to acquire possession pursuant to its motion and that the Court had no authority to enter an order granting the motion. *See, e.g.,* Transcript of Proceedings, at 58 (May 8, 1985).

For several reasons, the most prominent of which is its dismissal without prejudice by then U.S. District Judge Robert F. Chapman's Order of February 23, 1978, it is unnecessary for the Court at this time to rule upon the government's November 1977 motion for possession. The Court, however, is constrained to note the troubling implications of the government's present position with regard to its Motion for Possession. By its current contentions, it would appear that the government is conceding that said

motion was frivolous in that there was no legal authority for the granting thereof. The Court must so infer, or conclude that the government's present position borders on bad faith by disparaging its earlier motion in an attempt to support its argument that the possession it obtained pursuant to the Stipulation is somehow different, in any legally significant sense, from the possession it would have obtained by its motion. Either of these possibilities gives rise to serious questions regarding the propriety of the government's conduct in this litigation, and about prejudice to Congaree which, of course, first had to oppose the Motion for Possession, and now must attempt to respond to the government's attempt to disown said motion.

**11.** In fact, at the recent oral argument on the merits, the government apparently conceded that had possession been granted pursuant to the government's motion, interest would have been owed from the date thereof. Transcript of Proceedings, at 55–56 (May 8, 1985).

the parties entered into lengthy negotiations in an effort to resolve the issues presented by that motion and Congaree's opposition thereto. Those negotiations resulted ultimately in the Stipulation of February 23, 1978, which was submitted for approval and was approved by order of this Court on the same date.

A detailed recitation of all that transpired in those negotiations is unnecessary to deciding the issue presently before the Court. It is instructive, though, briefly to summarize the facts and circumstances surrounding those negotiations to reflect the views of the parties on the specific matter here at issue.[12] In doing so, the record reveals no contemporaneous dispute regarding the issue now before the Court. As laid out above, the government's November 1977 motion and memorandum had acknowledged Congaree's right to interest from the date of possession if title were later acquired. This entitlement having been recognized at the outset, the matter apparently was not the subject of debate. Near the close of negotiations, Congaree's counsel made reference to the previously acknowledged right to interest from the time of possession. Perhaps not surprisingly, in view of the government's previously stated position and the lack of any obligation by it to respond, the government's agents did not offer any disagreement. [Congaree Documents 4 and 5; Government Documents 86–88, and 90–95; Plaintiff's Memorandum of Points and Authorities in Support of Motion for Order of Possession (filed November 9, 1977).]

On February 23, 1978, the parties jointly requested the Court to enter an order of temporary possession. In their joint motion, signed by counsel for both the government and Congaree, the parties represented that they had agreed to a resolution of the issue of the government's right to immediate possession in accordance with the terms of a stipulation, which was attached to the joint motion, approval of which was requested from the Court. In this regard, the joint motion at paragraph "4" noted:

The parties have agreed, and the stipulation provides, that the Court may enter an order of possession in accordance with and subject to the terms of the stipulation.[13]

The stipulation itself, in the introductory paragraphs thereof, clearly states its purpose:

WHEREAS, Congaree Limited Partnership, defendant, represents that it is the owner of a fee simple estate in the land described in the complaint filed herein as Tract No. 101–02 (hereinafter referred to as the "Beidler tract"); and

WHEREAS, the United States, plaintiff (hereinafter referred to as the "government"), seeks to obtain immediate possession of the Beidler tract in order to preserve the plant and animal life on said tract; and

WHEREAS, the government recognizes that it will be liable to pay just compensation for the Beidler tract if it acquires it; and

WHEREAS, the government has filed a "Motion for Order of Possession" in this Court requesting such possession without the necessity that it file a declaration of taking or deposit its estimate of just compensation into the registry of the Court; and

WHEREAS, the defendant has by its pleadings filed herein, resisted the government's motion for possession of the Beidler tract without the government first employing the declaration of taking method of acquisition and depositing esti-

---

**12.** It should be made clear at this point that, to the extent any such issue was ever posed, there is no longer any contention that the totality of precedent circumstances nor the stipulation itself constituted any agreement between the parties in February of 1978 as to the interest issue. This Court's "Memorandum Order Regarding Landowner's Evidentiary Documents Four and Five" (filed February 8, 1985) succinctly explains the limited legal import which can be given to the pre-stipulation negotiations and correspondence.

**13.** The Court should note that neither the government nor Congaree has claimed that entry of the order jointly requested was beyond this Court's authority; nor has the government claimed that in requesting the Court to do so, the acts of its agents were unauthorized.

mated just compensation into the registry of the Court for defendant's use and benefit; and

WHEREAS, the government and the defendant desire to resolve the foregoing problems;

NOW, THEREFORE, IT IS AGREED BY AND BETWEEN THE PARTIES:....

Responding to the joint request of the parties, the Court entered on February 23, 1978, an Order allowing the government to enter into possession of the Large Tract and approving the Stipulation.

In terms of the dispute that then existed, as has been heretofore summarized, the Stipulation provided as follows:

(a) as to possession—Congaree assented to entry of a Court order allowing the government to have temporary possession for a period of one year (which term could be increased or decreased);

(b) as to employment of the Declaration of Taking Act—the government was not required to file a declaration of taking but agreed to do so within the term of the Stipulation or else abandon the condemnation proceeding (Civ. Action No. 77–2046);

(c) as to deposit of estimated just compensation—the government paid into the Court for the use of Congaree $2,000,000, which sum was to be applied toward the just compensation found owing to Congaree for whatever interest ultimately was acquired, either for the fee simple (if the acquisition was completed through filing of a declaration of taking) or for temporary possession (if the acquisition was abandoned).

Each of the foregoing disputed matters before the Court was resolved in the Stipulation by a compromise of the respective positions of the parties. [Joint Motion for

Approval of Stipulation and Entry of Order Granting Plaintiff Temporary Possession (filed February 23, 1978); Stipulation (filed February 23, 1978); Order (filed February 23, 1978).]

Although the Stipulation approved in the Court's Order of February 23, 1978, is fairly lengthy and detailed, the provisions necessary to understanding the issue now presented are relatively few. Paragraph 1 of the Stipulation provided for a deposit of $2,000,000 to be made by the United States "for the use and benefit of the defendant." The Court's Order notes that this deposit was made on February 23, 1978. Paragraphs 2 and 3 set forth the purpose of the deposit and how it was to be applied, in pertinent part, as follows:

2. That the deposit provided for in paragraph 1 of this stipulation will enable the government to have possession of the Beidler tract and the right to acquire it pursuant to the provisions of this stipulation, for a period of one year following the date of said deposit, subject to the provisions of paragraphs 5 and 7 of this stipulation.

3. That, regardless of any other provision of this stipulation, the deposit provided for in paragraph 1 of this stipulation shall be applied either:

(a) Against the amount ultimately determined to be just compensation for the taking of the Beidler tract, if the government elects to accept and pay said amount, or is required to do so; or

(b) Against any amount the government may ultimately be required to pay for possession of the Beidler tract (by judicial order or by settlement between the parties), if the government elects for any reason to abandon this proceeding ...

■ Thus, the parties agreed in the Stipulation that the deposit was to serve as a payment "on account" to Congaree, with the final sum owing to be determined in light of subsequent events.[14] [Stipulation

---

**14.** Except for the fact that it was not the government's estimate of just compensation for the Large Tract (which at that time was $32,936,-000), the $2,000,000 deposit in other respects was like a deposit made in conjunction with the filing of a declaration of taking under 40 U.S.C. § 258a. A deposit made pursuant to 40 U.S.C.

§ 258a (*i.e.,* "to the use of the persons entitled thereto"), upon application of the parties in interest, may be disbursed by the court "on account of the just compensation to be awarded...." On so much of the value of the property finally awarded as is covered by the deposit,

(filed February 23, 1978); Order (filed February 23, 1978).]

Paragraph 4 of the Stipulation provided as follows:

4. That the date of evaluation of the Beidler tract for the purposes of any trial in this action to determine the issue of just compensation for the taking of all or any part of the Beidler tract to which title is acquired, within the period provided for in this stipulation, shall be the date the government makes the deposit provided for in paragraph 1 of this stipulation.

In accordance with this provision, the parties tried before the Land Commission the issue of the fair market value of this property (the Large Tract) using a valuation date of February 23, 1978.[15] [Stipulation (filed February 23, 1978); Report of Commission (filed March 10, 1982).]

With regard to the effect of the Stipulation on the usual process of determining just compensation, the parties agreed, in paragraph 10, as follows:

10. That nothing in this agreement shall be construed to alter or abrogate the determination of just compensation (including damages for delay in payment) under existing and/or applicable law save for the determination of the date of evaluation as provided for in paragraphs 4 and 8 of this stipulation. It is expressly understood that this agreement resolves only the questions of temporary possession and the date of evaluation and that defendant remains fully protected by the fifth amendment of the U.S. Constitution and other applicable laws.

[Stipulation (filed February 23, 1978).]

It is undisputed that pursuant to the Court's Order of February 23, 1978, approving the Stipulation, the government took and maintained possession of the subject property for a two-year period extending from February 23, 1978 through February 22, 1980.[16] On that latter date, the last day of government possession under the Stipulation and the last day the government could file a declaration of taking and maintain the valuation date provided for in the Stipulation, the government did indeed file a declaration of taking to acquire title to (and the concomitant right to continued possession of) the Large Tract. Along with said declaration, the government deposited in the Registry of this Court the sum of $30,558,000 "for the use and benefit of the persons entitled thereto."[17] [Plain-

---

the government's obligation to pay interest ceases as of the date of deposit. Accordingly, in the present case, upon receipt of the $2,000,000 deposit, Congaree's entitlement to interest as part of just compensation on $2,000,000 of the final award of fair market value ceased, and the government's obligation to pay interest as part of just compensation on $2,000,000 of the final award of fair market value ceased.

**15.** Trial of the issue of fair market value was before a Rule 71A(h) commission. Prior to said trial, both parties submitted to the Court proposed commission instructions, and a lengthy hearing was held September 11, 1980, regarding appropriate instructions. At no time during this process did the government apprise the Court of its now-current two takings theory, which, if the government's current position is correct, arguably would have required that this Court instruct the commission regarding the need for a separate valuation of the alleged two-year temporary possessory estate. *See* Plaintiff's Brief in Support of Motion for an Order Determining that Interest Accrues from February 22, 1980 and Not Before, at 42–43, 45–46 (filed March 29, 1985) (measure of fair market value of temporary use and occupancy).

**16.** The original one-year term of possession set forth in paragraph 2 of the Stipulation was extended by operation of the terms of the Stipulation for exactly another year.

The government raises a point in its proposed Finding of Fact 19, apparently for the first time, which compels mention but which seems to have little import at this time. The Landowner arguably had and was aware of its option under ¶ 5(c) of the Stipulation to oust the government from its possession at any time subsequent to sixty days after May 1, 1979 and before the filing of the Declaration of Taking on February 22, 1980. However, "in the spirit of cooperativeness, the Beidler family refused to take advantage of this technicality" and let this apparent option expire. Government Document 126, at p. 6 (quoting from Landowner's attorney's opening statement).

**17.** The deposit of $30,558,000, when added to the $2,000,000 deposit made at the entry into possession, totaled $32,558,000, precisely the sum estimated as the Large Tract's fair market value as of February 23, 1978, by the government's appraiser Joseph W. Swearingen. *See* Government Document 124; [Plaintiff's Responses to Defendant's First Request for Admis-

tiff's Response to Defendant's First Request for Admissions, Response to Requested Admission No. 21 (filed April 3, 1984), *as modified by* this Court's Order Regarding Discovery, at 3 (filed October 11, 1984); Declaration of Taking (filed February 22, 1980).]

### *The Government's Possession*

The record demonstrates that during the period from February 23, 1978 through February 22, 1980, when the government was in possession of the Large Tract but had not yet acquired title, the government exercised significant dominion and control over the property. Documents in evidence show, *inter alia,* that (1) the government routinely patrolled the property; (2) among the purposes served by these patrols was the exclusion of trespassers, poachers, and illegal hunters; (3) the government enforced standards established in the Code of Federal Regulations on the property; (4) the government conducted numerous tours of the property for visitors and permitted filming and photographing of the property by non-government personnel; (5) the government undertook numerous and varied activities to preserve and maintain the property; (6) government agents and contractors entered upon the property on many occasions for the purpose of conducting studies relating to the property's resources and the long-term management thereof; and (7) in one particular instance, the government vigorously acted to terminate alleged trespasses upon the Large Tract by one Frank Barron, claiming that he had "trespass[ed] on Government land," threatening him with a lawsuit, and

requiring him to undertake corrective actions to ameliorate the conditions created by the alleged trespass. [Congaree Documents 17, 22 and 23].

The government's possession during this two-year period prior to acquiring title was almost exclusive. The only actual possession exercised by the Landowner consisted primarily of the continued use of the property for hunting purposes by the Landowner's lessee,[18] as had been specifically provided for in the authorizing legislation. Agents of the Landowner also entered upon the property to conduct studies necessary to prepare for and try the issue of the property's fair market value. However, it is undisputed that, even had the government had title to the property at that time, such access rights were available to the Landowner under Rule 34(a)(2) of the Federal Rules of Civil Procedure. It is also undisputed that during the period from February 23, 1978 through February 22, 1980, inclusive (the period of time during which the government had possession but had not acquired title), neither the Landowner nor anyone else acting pursuant to a contract from the Landowner for the sale of merchantable timber harvested any timber from the Large Tract[19]. [Responses of Defendant Congaree Limited Partnership to Government's First Request for Admissions, Responses to Requested Admissions No. 16–21 (filed July 9, 1984); Responses of Defendant Congaree Limited Partnership to Government's Third Request for Admissions, Responses to Requested Admissions No. 2 and 3 (filed November 7, 1984); Plaintiff's Responses to Defendant's First

---

sions, Response to Requested Admission No. 22 (filed April 3, 1984), *as modified by* this Court's Order Regarding Discovery, at p. 3 (filed October 11, 1984).]

**18.** Rental payments collected for hunting privileges were made to Congaree during this period of time. There is evidence of record, however, that Congaree contemporaneously recognized that the right to those payments was in question after the government entered into possession. [Congaree Document 18.] These rental payments apparently were calculated to cover the ad valorem tax liability which, under eminent domain law, *United States v. 412.714 Acres,* 60

F.Supp. 576 (N.D.Cal.1945), remained with the Landowner as title holder even though the government held possession. While the taxes presumably have been paid, these lease payments are, as mentioned in Congaree Document 18, still held in escrow by the Landowner pending final resolution of this case. See Transcript of Proceedings, at 9–12 (May 8, 1985).

**19.** Had the Landowner attempted to sell or harvest timber after February 23, 1978, the government could have, and presumably would have, sought enforcement of its possessory rights via the Court's contempt powers.

Request for Admissions, Response to Requested Admission No. 16 (filed April 3, 1984); Plaintiff's Responses to Defendant's Second Request for Admissions, Responses to Requested Admissions No. 18 and 19 (filed May 23, 1984).]

### The Current Issue

As regards the issue now in dispute before this Court, the record reflects that for a period of approximately two years subsequent to the Stipulation and Order of February 23, 1978, government representatives at least expressed no disagreement with the view that the obligation to pay interest ran from the date of entry into possession. Such views were expressed by the Chief, Land Acquisition Section, Land and Natural Resources Division, of DOJ (December 14, 1979), by the Deputy Director, of NPS, Department of the Interior (January 31, 1980), and by the Deputy Assistant Attorney General, Land and Natural Resources Division, of DOJ (February 8, 1980). [Congaree Documents 20, 13, and 14.] Particularly noteworthy is the first of the above-cited items, a legal memorandum, which stated:

### Question Presented

Whether, in the [Congaree condemnation] case, where the United States has filed a complaint but no declaration of taking and has obtained an order of possession prior to trial of the issue of just compensation and satisfaction of judgment, the Government will be obligated to pay interest on the amount of compensation finally awarded from the time of possession until the time of payment of the award.

### Conclusion

*The federal law of just compensation obligates the United States in the circumstances of this case to pay interest on the amount of compensation finally awarded by the court from the time of possession until the time of payment of the award.*

[Congaree Document 20, at 1 (emphasis added).]

In fact, the first recorded indication of government disagreement with the proposition that interest would commence to run from the date of entry into possession came on February 11, 1980, in internal correspondence within the National Park Service. [Government Document 133, at 4.] This NPS disagreement was communicated to the Department of Justice on April 11, 1980. [Government Document 141.] The asserted basis of the disagreement was that the Stipulation did not specifically state that interest would be owed from the time of possession and that, accordingly, under principles of government contract law and the case of *Albrecht v. United States*, 329 U.S. 599, 67 S.Ct. 606, 91 L.Ed. 532 (1947), no interest was owed.

The government's current position was first made known to the Court in a memorandum filed December 16, 1983. [Memorandum of the Plaintiff United States: In Opposition to Defendant's Motion for Approval of Procedure and for Adoption of Schedule for Further Proceedings, in Support of Plaintiff's Motion for Approval of Procedure and for Adoption of Schedule for Further Proceedings, and Status Statement, at p. 5 (filed December 16, 1983).] That position is that the subject proceeding has involved two separate takings of the Large Tract—one of a temporary possessory estate by contract for the period February 23, 1978 to February 22, 1980, and the other of a fee simple estate by filing of a declaration of taking on February 22, 1980. The government thus argues now that interest is due only from February 22, 1980.

### II. DISCUSSION AND LEGAL ANALYSIS

#### Prologue

So, against this broad panorama of almost a decade of legislation, negotiation, and litigation, the lingering issue of the commencement of the government's interest obligation prompts this Court's final expedition into the jurisprudential darkness of the Congaree Swamp. As landmarks for this perilous journey, the government provides its apparently novel "two takings"

theory while the Landowner supplies the perhaps deceptively simple "possession-equals-taking" rule of *United States v. Dow,* 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958). Before departing, the Court must observe that, while neither position equips an adventurer with a bedrock footing, they thankfully also do not lay a disguised quicksand trap of confusion and terminal despair.

### Fifth Amendment's Interest Component

■ The trip begins safely enough with the Fifth Amendment's admonition that "... nor shall private property be taken for public use, without just compensation." United States Constitution Amendment V. As the U.S. Supreme Court has observed, "such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good a position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller,* 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed. 336 (1943). The practical application of this principle gave rise to the now well established rule that a proper rate of interest is to be paid "where the United States condemns and takes possession of land before ascertaining or paying compensation." *Seaboard Air Line Ry. Co. v. United States,* 261 U.S. 299, 306, 43 S.Ct. 354, 356, 67 L.Ed. 664 (1923); *accord United States v. Klamath & Moadoc Tribes,* 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938); *United States v. Alcea Band of Tillamooks,* 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951). It is equally well-established that the interest due as a component of just compensation is to begin accruing on the date of taking and continue until the date of payment. *Albrecht v. United States,* 329 U.S. 599, 602, 67 S.Ct. 606, 610, 91 L.Ed. 532 (1946) (*See also* cases cited therein in note 4). So, the sole issue which has prolonged this litigation for over two years can be condensed to the deceivingly short question: What is the constitutional "date of taking" which commences the government's interest obligation?

### The Dow, and this Court's, Response

■ Actually, a cursory reader might conclude that this Court had inferred some undue reassurance from the brevity of its inquiry and had accordingly reached an equally short conclusion. Perhaps surprisingly, the Court's express holding today is simply that, based on the rather broad but indistinguishable rule of *United States v. Dow,* the physical possession of the Large Tract acquired by the government on February 23, 1978 established the date of taking and commences its interest obligation, even though its declaration of taking and receipt of title did not ensue until February 22, 1980. This decision has not, however, been reached without exhaustive research and considerable thought. It is, similarly, not a legal question on which reasonable litigants cannot disagree nor one requiring less than thorough appellate review.

In *Dow* the Supreme Court was asked to determine the rightful claimant to a just compensation award for the governmental taking of a pipeline right-of-way in southern Texas. Under the authority of the Second War Powers Act, the government had filed, in March of 1943, a condemnation petition which was granted by the district court in ordering the government into immediate possession of the easement. The government took possession and completed the laying of the pipeline within the same year. In 1945 the entire 617 acre tract which the pipeline transversed was conveyed by the condemnee-owner to respondent Dow with specific exception made for the right-of-way. Finally, in May, 1946, the government, after continuous use of the pipeline, filed a declaration of taking along with the requisite estimate of just compensation. *See* 40 U.S.C. §§ 257–258.

As might be expected, a dispute arose between Dow's grantor, who owned the tract when the government took possession, and Dow himself, the subsequent but predeclaration-of-taking purchaser. When faced with this dispute, the district court granted summary judgment against Dow based on the Assignment of Claims Act, 31 U.S.C. § 302, but the Fifth Circuit reversed on the rationale that the compensation claim did not arise and vest until the filing

of the declaration of taking and the corresponding passage of title. After granting certiorari, the Supreme Court, by Justice Harlan, again reversed with the reasoning that:

> ... [I]t is undisputed that '[since] compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment'.... [However], [t]he passage of title does not necessarily determine the date of 'taking.' The usual rule is that if the United States has entered into possession of the property prior to the acquisition of title, it is the former event which constitutes the act of taking. It is that event which gives rise to the claim for compensation ...

*Dow*, 357 U.S. at 20–22, 78 S.Ct. at 1043–44 (quoting *Danforth v. United States*, 308 U.S. 271, 284, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939)). Thus, the Court granted the compensation award to the owners in 1943, when the government had taken possession of the property. However, for the disposition of the subject case, the reasoning and analysis subsequent to that quoted above is eminently more probative. As noted, Justice Harlan stated that, under the "usual rule," when the United States has entered into possession of property before acquiring title, the possession "constitutes the act of taking." *Id.* at 22, 78 S.Ct. at 1044. He continued with the crucial pronouncement that such *possession "fixes the date as of which ... the government's obligation to pay interest accrues."* Id. (emphasis added). This as yet still prevailing rule is obviously strong precedent for the instant case. In fact, in reviewing the analysis employed in *Dow*, several instructive similarities soon become apparent.

For example, after citing authority for this "usual rule" which extends back to 1903, *United States v. Lynah*, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539 (1903), the Court first noted that, but for the government's subsequent filing of a declaration of taking, "there [was] no reason to believe that these ordinary rules would not have been applicable...." *Dow* 357 U.S. at 22, 78 S.Ct. at 1044. However, the subsequent declaration only necessitated more thorough consideration by the Court; the rule ultimately still applied. The subject case also presents possession prior to a declaration of taking with the only apparent "but for" impediment to simple application of Dow's usual rule being this Court's grant of "temporary possession" pursuant to a stipulation agreement between the parties. Stipulation (entered February 23, 1978), p. 6, ¶ 10. As will be seen, this apparent impediment is not a formidable bar to the precedent and arguments presented by the Landowners.

The *Dow* Court rejected the respondent's argument that "although there was an entry into possession in 1943 which was an appropriation of the property sufficient to amount to a taking," the subsequent declaration of taking "vitiated the earlier entry" and determined the time of taking. *Dow* at 22, 78 S.Ct. at 1044. Similarly, this Court declines to accept the government's current contention that the Court-sanctioned Stipulation created only a temporary possessory estate which was followed by the actual "taking" by the filing of the official declaration. The government asserts that, since interest runs from the date of taking, it should accordingly only accrue since the creation of this later, the fee estate.

While, as in *Dow*, a "number of considerations" have led this Court to reject this "two takings" theory,[20] the Court is considerably influenced by the almost prophetic criticism of such a theory by the *Dow* Court. *Id.* at 23, 78 S.Ct. at 1045. Justice Harlan, after reiterating that "in cases where there has been an entry into possession before the filing of a declaration of taking, such entry has been considered the time of 'taking' for purposes of ... [21] fix-

---

20. Not the least of these reasons is the government's inability to provide any persuasive precedent for its theory. In fact, no pertinent precedent at all is cited.

21. The omitted language states that the entry into possession is considered the time of taking for "valuing the property." *Dow* at 24, 78 S.Ct. at 1045. It is noteworthy that, consistent with *Dow*, the parties here stipulated before possession was granted that the Large Tract was to be

ing the date on which the government's obligation to pay interest begins to run," described as a "Hobson's choice"[22] the government's precise position now, over twenty-five years later. *Id.* at 24, 78 S.Ct. at 1045. He explained that:

> To rule that the date of 'taking' is the time of filing would confront us with a Hobson's choice. On the one hand, *it would certainly be bizarre to hold that there were two different 'takings' of the same property, with some incidents of the taking determined as of one date and some as of the other.*
>
> *On the other hand, to rule that for all purposes the time of taking is the time of filing would open the door to anomalous results.* For example, if the value of the property changed between the time the Government took possession and the time of filing, payment as of the latter date would not be an accurate reflection of the value of what the property owner gave up and the Government acquired. In the graphic language of Chief Justice Shaw: 'If a pie-powder court could be called on the instant and on the spot, the true rule of justice for the public would be, to pay the compensation with one hand, whilst they apply the axe with the other.' *Parks v. Boston*, 15 Pick. (Mass.) 198, 308. Similarly, because interest for delay in payment would not begin to accrue until payment of compensation is due, the Government would be absolved of interest until it chose to file a declaration of taking, even though it had already been in possession, to the exclusion of the property owner, for some time.

*Id.* (citation omitted) (emphasis added).

The potential inequity of the first "anomalous result" above becomes particularly evident in the market manipulation scenario which was described by Justice Harlan and, interestingly, was sought to be avoided by the subject litigants in their Stipulation agreement. Harlan expressed the *Dow* Court's concern that the "uncertainty [of] when, if ever, a declaration would be filed after the Government's entry" could encourage manipulations which could disadvantage either party. *Id.* at 25, 78 S.Ct. at 1046. The Court deemed this "another reason why we cannot regard the time of filing as the time of the 'taking' in cases where the Government has already entered into possession." *Id.*

The *Congaree* litigants obviously understood this same danger for they, in paragraph 8 of the Stipulation, expressly recognized the government's control over filing a declaration and the Landowner's corresponding concern that the government might abandon the Large Tract only to later acquire it during an unfavorable timberland market. They thus agreed that if governmental possession under the Stipulation ceased, the government would not later take "advantage of lower market conditions." This Court's adoption of the government's view that only the filing of the declaration triggers its interest obligation would seem not only to ignore this policy rationale of *Dow*, but also to thwart the litigants' explicit agreement and certainly to revive the possibility for such market manipulation in future condemnation proceedings. This Court shares fully in the view of *Dow* that no rule should be adopted "which would open the door to such obvious incongruities and undesireable possibilities." *Id.*

*Dow* was based on other factors which are also equally pertinent to the subject case. For example, the Court addressed the laudable goal of establishing greater certainty in condemnation actions. Unlike either party here, *Dow* apparently had em-

---

valued as of the date the government made the deposit which also entitled the government to possession. *See* Stipulation, pp. 2 and 3, ¶s 1, 2 and 4.

**22.** As perhaps would be the case for some readers, this Court's knowledge of a "Hobson's choice" was greatly expanded by reference to M. Nicholson, *A Dictionary of American-English Usage*, p. 239 (1957). As might be expected, it is a "choice without an alternative; the thing offered or nothing." Interestingly, the phrase originated in 17th century Cambridge, England from a liveryman, Thomas Hobson, who required each of his customers wishing to rent a horse to take the one nearest the door. Ah, but that this Court's patrons could be so easily satisfied.

phasized that setting the Declaration filing date as the taking would engender more certainty. However, this Court must agree with the Court in *Dow* that a "physical possession equals taking" rule provides sufficient certainty. Such possession is indeed "readily ascertainable whether or not the Government ... uses condemnation proceedings ... or ever files a declaration of taking." *Id.* In fact, the alternative rule—ironically now urged by the government—creates its own "uncertainty" in the sense that the landowner, whose property rights may have already been restricted or infringed, cannot know whether the government will ever "take" his property or the extent of compensation he may expect for whatever property interest is later found to have been appropriated.

Finally, as *Dow* mentions, in balancing the impact upon the parties, neither proposed rule gives the government any greater flexibility than is already afforded it, nor imposes any obligation greater than already levied under Federal Rule of Civil Procedure 71A. *See Dow* at 26, 78 S.Ct. at 1046. However, the government's proposed theory would impose upon the Landowner the uncertainty described above and the inequity discussed below.

 Under Rule 71A, if the government decides it cannot afford to exercise its "option to buy the property at the adjudicated price" after a compensation trial, *Kirby Forest Indus. v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 2191, 81 L.Ed.2d 1 (1984), or if it abandons its possession before any such determination, it is still obligated to compensate the landowner for any public use made of the property. See Fed. R.Civ.P. 71A(i)(3) and the cases cited in *Dow* 357 U.S. at 26, 78 S.Ct. at 1046. So, under a possession-equals-taking rule, the government could still acquire possession "to prevent the cutting of timber [while at the same time] availing itself of the 'opportunity to determine whether the valuations leave the cost of completion with [its] resources.' " Plaintiff's Brief in Support of Motion for an Order Determining that Interest Accrues from February 22, 1980, and Not Before, p. 1, n. 1. [hereinafter referred to as "government's Brief on the Merits"]

*(quoting Danforth v. United States*, 308 U.S. 271, 284, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939) ). The government would simply have to pay for the flexibility of carefully deciding what, if any, permanent estate to acquire by paying interest to the affected landowner if title is ultimately obtained. Any perceived restriction on the government's flexibility imposed by the interest obligation pales by comparison to the inequities which a landowner would suffer by the government's being able to: (1) take possession and thwart his planned use of his property (i.e. timber cutting), (2) then decide whether it can afford to take title to the property, and (3) after a subsequent favorable award, only then pay him any compensation with no interest due from the date of the government's initial possession. In considering this not unlikely scenario, the old cliche of someone acquiring a cake and later eating it too comes immediately to mind.

### Dow's Predecessors and Progeny

The principles enunciated in *Dow* find strong foundation in prior federal cases and have been followed consistently in subsequent decisions which are both relatively numerous and recent. For example, *Anderson v. United States*, 179 F.2d 281 (5th Cir.1950), is illustrative of the pre-*Dow* view. The court there explained, in pertinent part, that:

The United States could have obtained title under the original proceeding begun in January, 1946, although it would have been a slower process. Had there been no declaration of taking filed in this case the title would, nevertheless, have been obtained at the end of a suit, and it would have related back to, and been based upon, the value at the time the United States took possession in the condemnation suit. (footnote omitted). The declaration of taking and the deposit of compensation were not the beginning of a new suit and were not in abrogation of the original suit, but constituted a further step in a suit already begun. *See Catlin v. U.S.*, 324 U.S. 229 [65 S.Ct. 631, 89 L.Ed. 911] (1945); *Dade County v. U.S.*, 142 F.2d 230 (5th Cir.1944). *If*

*there was a taking in January, there was not a second taking in November.* (emphasis added).

As may be apparent, in *Anderson,* the government had filed a complaint in condemnation seeking fee simple title to, and obtained immediate possession of, appellant's property on January 30, 1946. A declaration of taking with estimated just compensation was not filed until November 14 of that same year. Interestingly, the parties, while in a dispute with the landowner who argued for the latter and higher valuation of his land, had stipulated that interest would run from the date of possession. Regarding this stipulation, the Fifth Circuit simply acknowledged that it "is entirely consonant with the principle that because the landowners were from that date deprived of the use of their land, they were, therefore, from such date entitled to the use of its equivalent in money." *Id.* at 283.[23] This Court should finally note that the last quoted sentence of *Anderson,* like the similar statements in *Dow,* also seems a prophetic renunciation of the government's "two takings" theory in the subject case.

As to the post-*Dow* decisions, *Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963), exemplifies the almost summary adoption of the *Dow* rule which followed that land-mark decision. The Court in *Best* twice cited *Dow* in confirming that while the government may take property either by "entering into physical possession ... or by instituting condemnation proceedings under various Acts of Congress ... [and though] title to the property passes later, ... *the entry into possession marks the taking,* gives rise to the claim for compensation, and fixes the date as of which the property is to be valued." *Id.* at 340, 83 S.Ct. at 384. (emphasis added).

*Dow* was similarly cited approvingly and was explicitly "determinative of the issues before the court" in *United States v. 1,060.02 Acres of Land,* 215 F.Supp. 811, 814 (W.D.Ark.1963). In fact, although decided only five years after *Dow,* the case pronounced the "firmly established rule ... that if the United States has entered into possession of property prior to the acquisition of title, it is the entry into possession or the utilization of the property which constitutes the act of taking." *Id.*

Most recently,[24] Judge Tenney for the Southern District of New York followed *Dow* in succinctly stating that "if the government seizes a tract of land prior to filing a declaration of taking, the date of the actual physical possession constitutes the date of the taking." *United States v. 14.54 Acres of Land,* 599 F.Supp. 123, 125 (S.D.N.Y.1984),[25]

---

**23.** In accord with *Anderson,* see *Comparet v. United States,* 164 F.2d 452 (10th Cir.1947); *11,-000 Acres of Land v. United States,* 152 F.2d 566 (5th Cir.1945); *United States v. 26.3765 Acres of Land,* 62 F.Supp. 910, 911 (E.D.N.Y.1945) ("Where the Government takes possession prior to the filing of the declaration of taking it has been the practice to value the property as of the date possession was taken, and to allow interest for the period prior to the deposit of money with the declaration." (citation omitted.) ); *United States v. 412.715 Acres of Land,* 60 F.Supp. 576 (N.D.Cal.1945).

In a case discussed more fully later in this opinion and presenting government possession under an irrevocable license which specified the valuation date, the Fourth Circuit recognized that "had there been no license in question, the date of taking, we think, would be the date of the Government's entry into possession, since this preceded both the commencement of the action and also the filing of the declaration of taking." *Bank of Edenton v. United States,* 152 F.2d 251, 254 (4th Cir.1945).

**24.** Opinion entered on November 16, 1984.

**25.** *See also Fulcher v. United States,* 632 F.2d 278, 291 (4th Cir.1980) (en banc) (in dictum, noting that "when the power [of eminent domain] is exercised 'by physical invasion ... the usual rule is that the time of the invasion constitutes the act of taking, ... *United States v. Clarke,* 445 U.S. 253, 258 [100 S.Ct. 1127, 1130, 63 L.Ed.2d 373] (1979)' "); *United States v. Upper Potomac Properties Corp.,* 448 F.2d 913, 915 (4th Cir.1971) (Although an Order for Delivery of Possession had been entered, government did not have physical possession before the trial, yet the court concluded that the date of the order was the "time of taking" because a "stipulation" between the parties indicates that the rights of the defendants to the use of the land was limited in such a way as to be inconsistent with anything except a possessory right in the government with certain rights reserved to the defendants); *United States v. Herrero,* 416 F.2d 945 (9th Cir.1969), *cert. denied,* 397 U.S. 973, 90

### The Indistinguishable Dow

The government has attempted valiantly[26] to distinguish the rule of *Dow* and its progeny from the subject case. However, after careful consideration, this Court concludes that *Dow*'s literal rule that physical possession prior to acquisition of title constitutes the taking cannot be differentiated from the situation at hand.

In its vain attempt, the plaintiff here has emphasized that the government in *Dow*, proceeding and being granted possession under the authority of the Second War Powers Act[27] of March 27, 1942, 56 Stat. 176, "entered upon the property with the intent to take permanent possession and manifested that intent by constructing a permanent improvement." Government's Brief on the Merits at p. 31. The government now disclaims any intent, and certainly any manifestation, to take a permanent interest in the Large Tract and asserts that it, indeed, had no authority to acquire title when it commenced possession on February 23, 1978.

▮ Regarding these proffered distinctions, the Court would first note that, as the Landowner argues, there is no specific factual finding in *Dow* that the government's possession there was made with a permanent intent. However, the construction of the pipeline does at least imply a long-term commitment. A more fundamental point is that *Dow*'s "usual rule" does not explicitly require any initial intent to take permanent possession. In fact, *Dow* seemingly does not require any particular intent upon possession to constitute a taking. Indeed, the Court there did not address intent other than to express its concern, as discussed previously, for the potential inequity imposed upon a landowner by any initial governmental indecisiveness.

Similarly, neither *Dow* nor the cases preceding and following it explicitly require any manifestation of an intent to remain permanently either upon entering or during possession.[28] As the Landowner has ar-

S.Ct. 1090, 25 L.Ed. 267 (1970); *Fibreboard Paper Products Corp. v. United States*, 355 F.2d 752, 754 (9th Cir.1966) (simply stating that "when the government has not filed a declaration of taking ..., the date of taking is the date upon which the government enters into possession [and that] interest ... should run from that date."); *United States v. 17.0098 Acres of Land*, 269 F.Supp. 960, 962 (E.D.Pa.1967) ("[I]f the Government ... has entered upon the property or has utilized it for its purposes, there is a taking and just compensation becomes due on that date."); *Georgia-Pacific Corp. v. United States*, 568 F.2d 1316 (Ct.Cl.1978).

26. The government attorneys, Messrs. Strouse and Stuckey, have, throughout this Court's involvement with this case (since August of 1984), always exhibited a diligent and conscientious approach to their professional duties and left no stone unturned in advocating their client's position. However, such compliments cannot, unfortunately, be paid to the stance taken by some government entity, presumably the National Park Service, in basically ignoring the Justice Department's preliminary advice and deciding to litigate this interest issue for the past two years. Particularly given their arguable acquiescence by failing to state their disagreement with the Landowner's February 1978 view that interest would run from the government's acquisition of possession, and the fact that the principal amount of just compensation exceeded their initial authorization by over $10 million, it would seem that a very inefficient litigation

decision was made. It greatly distresses this Court to witness such governmental profligacy.

27. The cases cited herein in which the government has obtained uncompensated immediate possession of condemned property have been proceedings under the explicit provisions for the same under either this Second War Powers Act of March 27, 1942, 56 Stat. 177, or the Rivers and Harbors Act of 1918, 33 U.S.C. §§ 591 *et seq.* Because no such provision was included in the authorizing Act of October 18, 1976, in this case a dispute arose in which the Landowner contested the grant of such uncompensated, immediate possession to the government pursuant to the Motion of November 9, 1977. As noted, the Stipulation resolved this dispute and so the question of governmental authority for such possession without explicit legislative authorization is not presented in this case.

28. *See, e.g., Anderson v. United States*, 179 F.2d 281 (5th Cir.1950); *11,000 Acres of Land v. United States*, 152 F.2d 566 (5th Cir.1945); *United States v. 26.3765 Acres of Land*, 62 F.Supp. 910 (E.D.N.Y.1945) (no mention of "permanent improvements") (all of the preceding are pre-*Dow* ); *Fibreboard Paper Products Corp. v. United States*, 355 F.2d 752 (9th Cir.1966); *United States v. 1060.92 Acres of Land*, 215 F.Supp. 811 (W.D.Ark.1963) (obviously not involving "permanent improvements") (both of the latter two are post-*Dow* ).

gued, the pertinent question under *Dow* does seem to be *whether* the property is used and possessed by the government, not *how* it is used. Indeed, since the government's express mission in the subject case was to preserve and protect the property, the actual construction of any permanent improvements would have directly contravened Congress' directives. In essence, no improvements were deemed necessary and the government's preservation of the Congaree Swamp and its forests served as the manifestation of governmental intent. The government used the property by preventing the Landowners and their contractual partners from harvesting the financially but also ecologically valuable timber.

The government's final attempt to distinguish *Dow* focuses on the fact that there "the government proceeded under a War Powers statute that expressly authorized the granting of an order of immediate possession." Government's Brief on the Merits at p. 31. They argue that their entry into possession of the Congaree lands differed in that it was allowed under the parties' Stipulation agreement which granted temporary possession for a consideration.

Actually, this seems a factual difference without any legal distinction. While the enabling legislation for the Congaree Swamp National Monument does not authorize immediate possession, United States Circuit (then District) Judge Chapman's Order of February 23, 1978, expressly grants the government "temporary possession ... in accordance with and subject to the terms and conditions of the said Stipulation" and approves and validates the binding terms of the agreement. This Order was entered in the same condemnation proceeding (Civil Action No. 77–2045) in which the government initially sought immediate possession through their later disputed November 14,

1977 Motion for Order of Possession. In fact, the same Stipulation on which Judge Chapman's Order was based resolved the dispute over this earlier motion by granting possession and preserving the Landowner's right to just compensation. In light of all these circumstances, this Court is compelled to agree with the Landowner's contention that the Stipulation was merely the vehicle which granted possession to the government and which served as the functional and legal equivalent of the War Powers statute in *Dow* or any such authorizing legislation.[29]

■ This conclusion is generally supported by—and any contention that Dow's usual rule can only be applied to immediate, pre-declaration possession when specifically authorized by statute is refuted by—several "physical seizure-subsequent taking" cases. *See, e.g., United States v. Herrero,* 416 F.2d 945 (9th Cir.1969), *cert. denied,* 397 U.S. 973, 90 S.Ct. 1090, 25 L.Ed. 267 (1970); *United States v. 14.54 Acres of Land,* 599 F.Supp. 123 (S.D.N.Y. 1984). Specifically, the pre-*Dow* Sixth Circuit decision in *23 Tracts of Land v. United States,* 177 F.2d 967, 969–70 (6th Cir. 1949), presented a dispute closely analogous to *Dow* and contains a pertinent discussion:

> The claim for compensation to which a landowner is entitled for the taking of his property by governmental authority arises at the time of taking. The enactment of legislation which authorizes condemnation of property is not such a taking even though it may cause a change in the value of the property. Such legislation may be repealed or appropriations may fail. The filing of a petition in condemnation without taking possession is not a taking. The condemnor may discontinue or abandon his effort.

---

**29.** It should be noted that, unlike the contract which specified and thereby limited just compensation in *Albrecht v. United States,* 329 U.S. 599, 67 S.Ct. 606, 91 L.Ed. 532 (1947), the Stipulation does not provide for any contractual resolution of the interest issue in this case. The Stipulation's only reference to interest is in paragraph 10 which provides "That nothing in

this agreement shall be construed to alter or abrogate the determination of just compensation (including damages for delay in payment) [i.e. interest] under existing and/or applicable law...." Of course, the "applicable law" to which the determination of interest is committed is that now being explicated and applied by this Court.

Changes in value from such events are incidents of ownership rather than a "taking" in the constitutional sense. *Danforth v. United States*, 308 U.S. 271, 283–86 [60 S.Ct. 231, 235–37, 84 L.Ed. 240] (1939). *But it would seem clear that the taking of physical possession of the property by the Government and the appropriation of it to its own purposes is a taking for which the then owner is entitled to compensation under the constitution.* The owner at that time, rather than the owner at an earlier or later date, is the one who has the claim and is to receive the payment. *This would seem to be equally true whether the taking is without authority of a court order or in compliance with a court order requested by the condemnor.* (emphasis added; citations omitted).

In sum, the government has proffered no persuasive reason for this Court to distinguish the literal "physical possession constitutes taking" rule of *Dow*.[30]

### A Digression: The Rule May Change, But the Result is the Same

Just as Chief Judge Winter of the Fourth Circuit recently acknowledged that "ours is not the only imaginable system of tort law," *Owens v. Bourns, Inc.*, 766 F.2d 145, 151 (4th Cir.1985), this seems a propitious moment for this Court to recognize that *Dow*'s "usual rule" is not the only conceivable test with which to decide the subject case. For example, if greater emphasis were given to the reasonable implication from the *Dow* facts that the government there did enter with the intent to take permanent possession, such an intent requirement could be incorporated into the *Dow* rule.

In fact, even thirteen years before *Dow*, the implication of an intent element was discussed in dictum by the Fourth Circuit in *Bank of Edenton v. United States*, 152 F.2d 251 (4th Cir.1945) (discussed *supra* at note 22). The Court there was faced with a War Powers Act condemnation in which the government obtained, prior to the condemnation complaint and declaration of taking, an irrevocable license which specified its execution date as the date of valuation, but in the face of which the Landowner wanted the higher property valuation as of the declaration filing date. However, before upholding the license provision, Judge Dobie noted that, without the license, the "date of taking ... would be the date of the government's entry into possession [provided that] such entry ... *must be with the intention of exercising the right of eminent domain....*" *Id.* at 254.

### Government Intent in this Case

■ Having recognized that such a governmental intent inquiry could logically be pursued by a later court, this Court, on the facts at hand, need give it little further study. For, even with such a requirement, the disposition of this case remains the same. The government's intent ultimately to acquire at least some long-term interest in the Large Tract is manifested by several points. First, the government's acquisition by declaration of taking of the three smaller "Timber Sales Tracts" around the Large Tract indicates a strong commitment. Just the approximately 370 acres comprising these three tracts without the almost 15,000 acres in the Large Tract would hardly

---

30. Similarly, if the government has not all but completely abandoned it as a central precedent for its argument, then the government clearly does not explain nor emphasize any definite rule to be derived and applied from the recent U.S. Supreme Court decision in *Kirby Forest Indus. v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). It would certainly seem, as the Landowner has thoroughly and effectively argued, *See* Supplemental Brief of Defendant Congaree Limited Partnership (filed June 7, 1985) at 3–12, that *Kirby Forest* is, for purposes of the subject case, distinguishable from *Dow* because the government in *Kirby Forest* did not acquire possession of the property in question there until just compensation was paid and title had passed. Also notable is Section II of this recent opinion which largely addresses an inverse condemnation analysis and contains some language generally supportive of *Dow*'s usual rule. *See Kirby Forest* 104 S.Ct. at 2194–95 ("unless a taking has occurred previously in actuality" language at least implying prior government possession) (*quoting Danforth*, 308 U.S. at 284, 60 S.Ct. at 236).

have constituted the "National Monument" which Congress authorized "for the education, inspiration and enjoyment of present and future generations." Act of October 18, 1976, Pub.L. No. 94–545, 90 Stat. 2517. Second, the original complaint in condemnation which initiated the subject case, as if mindful of *Bank of Edenton,* specifically invoked the power of eminent domain and evinced the government's intent by stating that "the interest in the property to be acquired is as to [the Large Tract], an estate in fee simple title...." Third, the government substantiated its intent and referred to its legislative authority, which it had detailed in the original complaint, in its motion for immediate, uncompensated possession (filed November 9, 1977) when it explained that:

It was the concern of both the Legislative and Executive Branches of Government to preserve the Beidler Tract and its interdependent eco-systems for future generations of Americans. Section 2(a) of the Act provided that the Secretary of Interior was authorized " * * * to acquire lands, waters, and interests therein * * *." *Pursuant to this authority and in furtherance of the Congressional direction the instant case has been filed.*

Memorandum of Points and Authorities in Support of Motion for Order of Possession, at pp. 3–4 (emphasis added).

### The Government's Dominion and Control

Thus, the government's original mission and intent is clear. Moreover, this intent was substantiated or if, as the government has suggested in trying to distinguish *Dow,* a manifestation of intent element should be read into the "usual rule," [31] then the intent was manifested by the government's conduct here. That is, in essence, the government held continuous and almost exclusive possession of the Large Tract from February 23, 1978 until February 22, 1980, at which time it took fee title with a declaration of taking. During this crucial two year period, the government, through National Park Service ("NPS") personnel, not only preserved the Large Tract but also exercised substantial dominion and control over the property.

The uninterrupted and quite significant management wielded by the government during its "temporary possessory estate" is demonstrated by NPS' own records from its Columbia, South Carolina office. These record documents,[32] in their entirety, reveal, *inter alia,* that the government (1) routinely patrolled the property;[33] (2) that

**31.** The implication or development by an appellate court of what could be termed a "manifestation of intent" test or an "extent, assertion, or totality of possession" standard would *not* be illogical or unfounded. *See, e.g., Upper Potomac Properties Corp.,* 448 F.2d at 915 (where the rights of the landowner to the use of its land was said to be "limited in such a way as to be inconsistent with anything except a possessory right in the government...."); *Herrero,* 416 F.2d at 947 (where the Ninth Circuit, in discussing its earlier case of *Calvo v. United States,* 303 F.2d 902 (9th Cir.1962), recognized that the *Calvo* facts lacked any *"showing of assertion of possession by the government* after termination of its lease sufficient to constitute a taking by seizure." (emphasis added) ); *Fibreboard Corp.,* 355 F.2d at 752 (where, in holding that governmental possession constituted the taking, the Ninth Circuit noted that the landowners "were denied access to their road and [that] a portion of the road was physically destroyed"). *See also United States v. McCrory Holding Co.,* 294 F.2d 812, 818 (5th Cir.1941) (where, even in holding that the filing of the declaration of taking rather than the entry into possession constituted the date of taking, the court discussed the "charac-

ter of the [government's] possession" and the government's lack of performance of "any overt act fixing the extent and terms of its appropriation...."

Indeed, this Court considered developing a refinement or expansion of *Dow's* usual rule. However, given that the facts of the subject case compel a decision for the Landowner under the usual rule *or* an expansion of *Dow,* and, fully cognizant of the potential perception of impropriety in a district court's attempt to refine Supreme Court precedent of over twenty-five years duration, this Court shall leave such a decision to a higher authority.

**32.** *See* Congaree Documents 17, 22 and 23, certain pages of which were also introduced as Government Documents. These duplicative record documents *along with the pertinent document pages for each point of government control are detailed in notes following each enumerated point in the text.*

**33.** (*See e.g.,* Congaree Document 17: pp. 8, 16, 17, 19, 20, 21, 22, 23, 24, 25, 29, 30, 32, 38, 39, 41, 57, 60, 63, 68, 71, 74, 76, 79, 92, 96, 120, 126, 130, 135, 138, 139, and 142).

among the purposes served by these patrols was the exclusion of trespassers, poachers, and illegal hunters;[34] (3) enforced standards established in the Code of Federal Regulations on the property;[35] (4) conducted numerous tours of the property for visitors and permitted filming and photographing of the property by non-government personnel;[36] (5) undertook numerous and varied activities to preserve and maintain the property;[37] (6) agents and contractors entered upon the property on many occasions for the purpose of conducting studies relating to the property's resources and the long-term management thereof;[38] and (7) that in one particular instance, the government vigorously acted to terminate alleged trespasses upon the Large Tract by one Frank Barron, claiming that he had "trespass[ed] on Government land," threatening him with a lawsuit, and requiring him to undertake corrective actions to ameliorate the conditions created by the alleged trespass.[39] All of these activities were, of course, entirely consonant with the government's intention, in accordance with its legislative mandate, to preserve the Large Tract until title thereto was acquired.

In addition to being uninterrupted, the government's possession of the Large Tract from February of 1978 until February of 1980 (all pursuant to the Stipulation) was also virtually exclusive. Indeed, this exclusivity apparently was qualified in only two respects. First, before the government acquired possession, the Large Tract had been subject to a hunting lease entered into by Congaree with Mr. Marion Burnside on behalf of the Cedar Creek Hunting Club. The most recent renewal period of that lease had commenced September 15, 1977, and, as amended, ended December 31, 1982. *See* Attachment B to the Government's "Notice of Filing Documents" (filed November 16, 1984).

This hunting lease was explicitly acknowledged, and its continuing operation permitted, in the authorizing Act of October 18, 1976. *See* Pub.L. No. 94–545, § 2(b), 90 Stat. 2517 (1976). As discussed in note 18 of this opinion's Findings of Facts section, the rental payments received by the Landowner under this lease were calculated to cover their *ad valorem* tax liability, and are still held in escrow pending final resolution of this case.

Second, members of the Beidler family and their agents and representatives entered onto the Large Tract during the period February 23, 1978, to February 22, 1980, for the purpose of measuring, grading, and valuing timber, as part of their preparation for trial in this action on the issue of the Large Tract's fair market value. The government has admitted that these per-

---

**34.** (*See e.g.,* Congaree Document 17: p. 87, numbered ¶ 3, referring to "watching for indications of trespass and poaching activity;" p. 119, numbered ¶ 1, referring to "an attempt to locate where illegal hunters were entering the park [and] looking for signs of illegal hunting;" p. 132, numbered ¶ 3, referring to plans for "continued patrol of area with special attention to possible trespass and illegal hunting;" and p. 144, numbered ¶ 5, referring to plans for "continued patrol and protection of area").

**35.** *See* Congaree Document 17: p. 157 (legal opinion, dated March 24, 1978, from NPS, Southeast Region, Regional Solicitor to the Regional Director stating that NPS "not only may but is required to enforce the Code of Federal Regulations and exercise other management functions within the monument during the negotiating period.") This is also Government Document 102.

**36.** *See, e.g.,* Congaree Document 17: numbered ¶ 1 on pp. 11, 13, 15, 18, 25, 29, 35, 47, 53, 64, 78, 84, 85, 93, 97, 98, 109, 125, 131, 133, 137, numbered ¶ 2 on p. 100, and pp. 142 and 145–46.

**37.** *See, e.g.,* Congaree Document 17: numbered ¶ 1, pp. 20 and 67 (fire investigation and protection); numbered ¶ 1, pp. 103, 107, and 108 (removal of water lilies from pond); p. 43, (removal of trees from roadway); p. 34, numbered ¶ 3 and p. 35, numbered ¶ 1 (removal of trash); and p. 86, numbered ¶ 1 (inspection of pine bettle infestation).

**38.** *See* Congaree Document 17: numbered ¶ 1 on pp. 18 (archeology study), 27 (natural resources survey), 37 (ecology study), and 69 (water survey).

**39.** *See* Congaree Document 17: pp. 33, 61, 75, 77, 84, 88, 89, 98, 100, 102, 119, 127 and 181–85; and Congaree Document 22 (official correspondence re: Barron trespass). pp. 18–185 of Congaree Document 17 also comprise Government Document 103.

sons were entitled to access to the property for these purposes [40] under Rule 34 of the Federal Rules of Civil Procedure.

*Extent and Impact of Possession on Retained Ownership Rights*

A consideration of the potential utility and value which either party could have derived from the Large Tract during the government's possession highlights the impact that this possession had on any ownership rights retained by the Congaree Limited Partnership. For example, although the Landowners theoretically could have sold or mortgaged their remaining interest in the Large Tract during the government's possession, the likelihood of attracting any buyer or lender interest would have been nil.

This severe restriction on ownership occurred because, as the facts show, the government went into possession of the Large Tract in the context of an already ongoing condemnation proceeding, in which its announced intention was to acquire fee simple title to said property. The government entered into possession under a court order adopting the parties' Stipulation. That order and the underlying Stipulation recognized no exceptions to the government's possession. In this posture, a purchaser of Congaree's fee title in the Large Tract could not have received possession of the property.

Moreover, in the event the condemnation was completed by acquisition of title *during* the term of the Stipulation, such a purchaser would not have been entitled to the proceeds from the condemnation action. (*See* Stipulation ¶ 3(a)). This is because purchase of the right to the just compensa-

tion owed for the fee acquisition would have been contrary to the Assignment of Claims Act, 31 U.S.C. § 3727, the successor statute to the statutory provision precluding recovery by the respondent in *Dow. See Dow* 357 U.S. at 20–21, 78 S.Ct. at 1043–44; *23 Tracts of Land*, 177 F.2d at 970.

Under the Assignment of Claims Act, the assignment of an entitlement to just compensation would be valid "only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued." *See* 31 U.S.C. § 3727(b). In the present case as of this date, the amount of the claim has yet to be decided, and obviously no warrant for payment thereof has been issued. Thus, since February 23, 1978, a hypothetical purchaser could not have validly purchased Congaree's entitlement to the just compensation award.

■ In sum, a buyer of the fee title to Congaree's Large Tract after February 23, 1978, as the circumstances of this case developed,[41] would have been unable to realize any financial benefit from such a purchase. Theoretically, Congaree could encumber title by giving a mortgage. The purpose of a mortgage, however, is to secure a debt. Such a transaction presupposes that someone would lend money to Congaree in a situation where in actuality neither the property nor the condemnation award for the taking thereof would, in the circumstances of this case, have had any value whatsoever as security, for the reasons reviewed above. The chances of finding a willing arms-length lender under such

---

**40.** In regard to both of these limitations on the exclusivity of the government's possession and control of the Large Tract under the Stipulation, see generally Nos. 16–19, 21 of the government's [First] Request for Admissions, and Congaree's responses thereto, "Responses of Defendant Congaree Limited Partnership to Government's [First] Request for Admissions," (filed July 9, 1984), at 9–12; Nos. 2, 3 of the Government's Third Request for Admissions, and Congaree's responses thereto, "Responses of Defendant Congaree Limited Partnership to Government's Third Request for Admissions," at 2–3 (filed November 7, 1984).

**41.** There remains the possibility that the government could have abandoned the acquisition (*see* Stipulation, ¶ 3(b)). This option remained open until February 22, 1980. In that event, a hypothetical purchaser, who had speculated that such an event would transpire, would then have been entitled to possession upon abandonment by the government. The claim for just compensation for the temporary possession actually had by the government would have remained with Congaree and have been subject to the same provisions of the Assignment of Claims Act discussed above.

 

circumstances would most likely have been non-existent.[42]

### Epilogue

Having now completed its circuitous, sometimes treacherous, but always challenging journey through the dark and dank confines of the Congaree Swamp (now) National Monument, this Court reaches the inevitable point of disembarking by proclaiming its conclusions of law, entering an appropriate order, and then, eagerly and joyously after having finished this Herculean task, moving on to new adventures.

### III. CONCLUSIONS OF LAW

As a threshold matter, the Court concludes that, because this case involves a question of federal constitutional law, this Court has jurisdiction over it under 28 U.S.C. § 1331.

As to the merits, resolution of the legal issue presented by the pending motions of the parties requires this Court to determine the date on which the Congaree Limited Partnership's property was "taken" in the constitutional sense. This date of taking is the date on which Congaree's right to just compensation accrued or, more pertinently, the date on which the government's obligation to pay interest as a component of just compensation commenced.

After full consideration of the parties' motions, briefs, supporting documents, replies thereto, the evidence offered and admitted, and the entire record in this case, the Court hereby finds, determines, and concludes that, under the prevailing rule [43] of *United States v. Dow*, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958), and its

progeny, the date of taking of the Large Tract was the date that the government entered into possession pursuant to Order of this Court, February 23, 1978. Accordingly, the defendant, Congaree Limited Partnership, shall recover from the plaintiff, United States, interest from February 23, 1978.

---

**42.** As this matter was briefed and when the Court raised questions concerning the government's initial intent and the control and utility held by either party during the government's two year possessory estate, both litigants were concerned that the Court might incorrectly engage in an "inverse condemnation" analysis to decide the subject case. Indeed, the foregoing discussion of intent, control, and impact on ownership touches many of the same factors quite pertinent in such an analysis. However, this Court is expressly *not* basing its decision on an inverse taking theory. These points are only raised for the sake of completeness and to dem-

onstrate that, even if a higher court should more broadly read *Dow*'s possession rule and establish an expanded test, this Court's conclusion—that the date of taking which commenced the government's interest obligation was February 23, 1978—would not change.

**43.** As fully explained in the preceding Discussion and Legal Analysis section, this Court shall leave to a higher court the question of the necessity and propriety of refining or expanding *Dow*'s usual rule. See p. 1255 and note 31 *supra.*